Wayne **POWELL, as Executor of the estate of Dana Kimberly Devilla, Plaintiff–Appellant,**

v.

Sunny **SCHRIVER, Superintendent; Thomas A. Coughlin, III; C.O. Lynch; C.O. Crowley, Defendants–Appellees.**

**No. 543, Docket 97–2851.**

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1998.

Decided April 2, 1999.

James Ostrowski, Buffalo, NY (Salvatore P. Abbate, on the brief), for plaintiff-appellant.

Daniel Smirlock, Assistant Attorney General, Albany, NY (Dennis C. Vacco, Attorney General; Peter H. Schiff, Deputy Solicitor General; Nancy A. Spiegel, Assistant Attorney General, on the brief), for defendants-appellees.

Before WINTER, Chief Judge, and OAKES and JACOBS, Circuit Judges.

JACOBS, Circuit Judge.

Plaintiff Dana Kimberly Devilla filed suit in the United States District Court of the Western District of New York (Foschio, *M.J.*), alleging that while she was an inmate at Albion Correctional Facility,

Correction Officer Jeffrey Lynch disclosed to other inmates and staff members that she was an HIV-positive transsexual, thereby violating (*inter alia*) her constitutional right to privacy, as well as her Eighth Amendment right to be free from cruel and unusual punishment. Devilla's complaint also named Lynch's supervisor, Sunny Schriver, on the theory that Lynch's disclosure resulted from Schriver's failure to properly train Lynch.

Prior to trial, the court dismissed the Eighth Amendment claim, apparently on the ground of qualified immunity. The privacy claim proceeded to trial, and the jury returned a verdict in favor of Lynch but against Schriver. The district court concluded that a verdict absolving the actor and holding the supervisor liable was fatally inconsistent and set it aside, entering judgment in favor of both Lynch and Schriver. Devilla appeals, seeking reinstatement of the verdict.

With respect to Devilla's Eighth Amendment claim, we conclude that the district court erred in granting qualified immunity. With respect to Devilla's privacy claim, we conclude that Schriver (the defendant found liable by the jury) is protected by the doctrine of qualified immunity, and on that ground we affirm the entry of judgment in Schriver's favor.

## BACKGROUND

In 1974, long before her imprisonment, Devilla began a series of operations to change her sex from male to female. In 1991, while in the custody of the New York State Department of Corrections, Devilla tested positive for Human Immunodeficiency Virus ("HIV"), the virus that eventually causes Acquired Immune Deficiency Syndrome ("AIDS").

In December of 1991, Devilla was incarcerated at the Albion Correctional Facility in New York. On December 31, 1991, Correction Officers Lynch and Crowley were escorting Devilla to Albion's medical facility when Lynch told Crowley—in the presence of other inmates and staff members— that Devilla had had a sex-change operation and that she was HIV-positive. Devilla maintains that as a result of Lynch's comment, word about her sex-change operation and her HIV-positive status became known throughout the prison and that she thereafter became the target of harassment by guards and prisoners.

Devilla filed a *pro se* complaint in the District Court for the Western District of New York. After retaining an attorney, she filed an amended complaint naming Officers Lynch and Crowley; Sunny Schriver, Albion's superintendent; and Thomas Coughlin, the Commissioner of the Department of Correctional Services of the State of New York. After filing the amended complaint, Devilla consented to proceeding before Magistrate Judge Leslie G. Foschio. In April of 1995, Devilla died, and her executor, the Reverend Wayne Powell, was substituted as plaintiff. (Notwithstanding this substitution, for ease of reference, this opinion continues to refer to Devilla as the plaintiff.)

The amended complaint alleged under 42 U.S.C. § 1983 (1994) that the defendants had violated her constitutional right to privacy, deprived her of her constitutional rights to life, liberty, due process of law and equal protection as guaranteed by the Fifth and Fourteenth Amendments, and inflicted cruel and unusual punishment in violation of the Eighth Amendment. Devilla also alleged negligent failure to care, intentional infliction of emotional distress, and violation of two state statutes, § 137(5) of New York's Correction Law, which prohibits the use of corporal punishment to discipline inmates as well as the "degrading treatment" of inmates, and § 2782(3) of New York's Public Health Law, insofar as it affords persons the right to maintain the confidentiality of their HIV status.

During the course of the trial, the court dismissed Crowley and Coughlin, as well as several of Devilla's causes of action, including—on the ground of qualified im-

munity—Devilla's claim that the defendants had violated her Eighth Amendment right to be free from cruel and unusual punishment. As a result of these pre-deliberation rulings, the jury was left to decide only the following questions: (i) whether, by divulging her HIV-positive status and transsexualism, Lynch had violated either Devilla's constitutional right to privacy or § 2782(3) of New York's Public Health Law, and (ii) whether, by "fail[ing] to properly train ... Lynch[ ] regarding a person's constitutional right to privacy," Schriver had violated Devilla's constitutional right to privacy.

After two days of deliberations, the jury returned a verdict in favor of Lynch but against Schriver. The jury awarded Devilla $5,000 in compensatory damages and $25,000 in punitive damages.

The district court entered judgment in accordance with both the jury's verdict and the pre-deliberation rulings. After entry of judgment, Devilla filed a motion for attorney's fees and costs, and Schriver filed a motion asking that the verdict against her be set aside both (i) because she was protected by the doctrine of qualified immunity and (ii) because the verdict was against the weight of the evidence and inconsistent with the verdict in Lynch's favor. The district court granted Schriver's motion on the ground that the verdict against Schriver was fatally inconsistent with the verdict in Lynch's favor because (in the court's words) "[i]t is well settled that a claim of inadequate training and supervision under 42 U.S.C. § 1983 cannot be made against a supervisor without a finding of a constitutional violation by the persons supervised." The court denied Devilla's application for attorney's fees and costs on the ground that Devilla was not a prevailing party. An amended judgment was entered in favor of all of the defendants.

Devilla appeals the dismissal of her Eighth Amendment claim on the basis of defendants' qualified immunity, the denial of her oral application to dismiss a pro-spective juror for cause, the grant of Schriver's motion to set aside the verdict, and the denial of Devilla's application for attorney's fees and costs.

As to Devilla's right to privacy claim, we affirm the entry of judgment in Schriver's favor on the ground that Schriver is protected from liability by the doctrine of qualified immunity. We therefore do not reach Devilla's claim that the court erred by refusing to dismiss a prospective juror for cause. As to the dismissal of the Eighth Amendment claim on the ground of qualified immunity, we vacate the judgment and remand for further proceedings consistent with our opinion. Because we vacate the dismissal of the Eighth Amendment claim, we also vacate the denial of Devilla's application for an award of attorney's fees, which was predicated on the court's conclusion that Devilla was not a prevailing party, a determination that cannot yet be made.

## DISCUSSION

### A. The Right to Privacy Claim

Devilla's privacy claim presents the question: does the Constitution protect a prisoner's right to maintain the confidentiality of HIV-positive status or transsexualism? As the Supreme Court recommends, we consider Schriver's qualified immunity defense only after first deciding whether Devilla "has alleged a deprivation of a constitutional right at all." *County of Sacramento v. Lewis,* 523 U.S. 833, ―― n.5, 118 S.Ct. 1708, 1714 n.5, 140 L.Ed.2d 1043 (1998).

Bearing on this question is our opinion on HIV status in *Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994): "Individuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition." In *Doe,* the plaintiff was not a prison inmate. *See id.* at 265. This appeal therefore raises two previously unresolved issues: first, whether the holding in *Doe* means that transsexuals have the right to confidential-

ity, and second, whether the right to confidentiality recognized in *Doe* exists in prison. We address each of these questions, and then proceed to consider Schriver's invocation of qualified immunity.

### 1. The Right to Confidentiality

We conclude that the reasoning that supports the holding in *Doe* compels the conclusion that the Constitution does indeed protect the right to maintain the confidentiality of one's transsexualism. Our analysis in *Doe* begins with the principle, recognized by the Supreme Court, "that there exists in the United States Constitution a right to privacy protecting 'the individual interest in avoiding disclosure of personal matters.'" *Id.* at 267 (quoting *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977)). We explained that "this right to privacy can be characterized as a right to 'confidentiality,' to distinguish it from the right to autonomy and independence in decision-making for personal matters." *Id.* We then concluded that "the right to confidentiality includes the right to protection regarding information about the state of one's health," reasoning that "there are few matters that are quite so personal as the status of one's health, and few matters the dissemination of which one would prefer to maintain greater control over." *Id.* Finally, we noted that the interest in the privacy of medical information will vary with the condition. Thus, *Doe* decided that the interest is at its zenith in the context (presented in *Doe*) of a person's HIV status. The reasons stated are particular to HIV, but in critical respects invite application to secret transsexualism:

> Clearly, an individual's choice to inform others that she has contracted what is at this point invariably and sadly a fatal, incurable disease is one that she should normally be allowed to make for herself. This would be true for any serious medical condition, but is especially true with regard to those infected with HIV or living with AIDS, considering the unfor-

tunately unfeeling attitude among many in this society toward those coping with the disease. An individual revealing that she is HIV seropositive potentially exposes herself not to understanding or compassion but to discrimination and intolerance, further necessitating the extension of the right to confidentiality over such information.

*Id.*

Individuals who have chosen to abandon one gender in favor of another understandably might desire to conduct their affairs as if such a transition was never necessary. That interest in privacy, like the privacy interest of persons who are HIV positive, is particularly compelling. Like HIV status as described in *Doe,* transsexualism is the unusual condition that is likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others.

The excrutiatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate. *See, e.g., Farmer v. Moritsugu,* 163 F.3d 610, 611 (D.C.Cir. 1998) (per curiam) (describing transsexualism as "a gender identity disorder, the sufferers of which believe that they are 'cruelly imprisoned within a body incompatible with their real gender identity,'" and noting that "[t]he disorder is commonly accompanied by a desire to change one's anatomic sexual features to conform physically with one's perception of self" (quoting *The Merck Manual of Medical Information* 418 (1997)); *Maggert v. Hanks,* 131 F.3d 670, 671 (7th Cir.1997) (describing transsexualism as a "profound psychiatric disorder," the cure for which (in the case of the male transsexual) "consists not of psychiatric treatment designed to make the patient content with his biological sexual identity—that doesn't work—but of estrogen therapy designed to create the secondary sexual characteristics of a woman followed by [genital surgery]"). It is similarly obvious that an individual who reveals that she is a transsexual "potentially

exposes herself ... to discrimination and intolerance." *Doe,* 15 F.3d at 267.

■ Within narrow parameters, the question of whether the privacy of certain medical conditions should be constitutionalized has been answered by *Doe* in the affirmative. We now hold, as the logic of *Doe* requires, that individuals who are transsexuals are among those who possess a constitutional right to maintain medical confidentiality.[1]

### 2. The Right to Confidentiality in Prison

■ We next consider whether this constitutional right to privacy exists in prison. "Prison inmates do not shed all fundamental protections of the Constitution at the prison gates." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citing *Turner v. Safley,* 482 U.S. 78, 95, 107 S.Ct. 2254, 2265, 96 L.Ed.2d 64 (1987)). Rather, inmates "retain[ ] those [constitutional] rights that are not inconsistent with [their] status as.... prisoner[s] or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). A regulation that "impinges on

inmates' constitutional rights" is therefore valid only if it "is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261.

As explained earlier in this opinion, this Court already has accorded constitutional stature to the right to maintain the confidentiality of previously undisclosed medical information. It follows that prison officials can impinge on that right only to the extent that their actions are "reasonably related to legitimate penological interests."[2] We further conclude that the gratuitous disclosure of an inmate's confidential medical information as humor or gossip—the apparent circumstance of the disclosure in this case—is *not* reasonably related to a legitimate penological interest, and it therefore violates the inmate's constitutional right to privacy.[3]

It is easy to think of circumstances under which disclosure of an inmate's HIV-positive status *would* further legitimate penological interests. Several circuits have upheld against constitutional challenge the practice of segregating HIV-positive prisoners from the rest of the prison population, on the theory that such segregation is a reasonable anti-contagion

1. As is the case with HIV status, the right to maintain the confidentiality of one's transsexualism may be subject to waiver. *See Doe v. Marsh,* 105 F.3d 106, 111 (2d Cir.1997) ("[O]ur decision in *Doe v. City of New York* indicates that a plaintiff with HIV may have waived his right to privacy by entering into a settlement agreement that he knew would become a matter of public record....").

2. In *Doe*—a case in which the party claiming the right to confidentiality was *not* a prisoner—we held that the right to maintain the confidentiality of personal information is something less than a fundamental right. *See Doe,* 15 F.3d at 269–70 (stating that "some form of intermediate scrutiny or balancing approach is appropriate as a standard of review" and that the state actor's interest in dissemination must be "substantial"). The "reasonably related to legitimate penological interests" test nevertheless applies. *See Washington v. Harper,* 494 U.S. 210, 221, 223, 110 S.Ct. 1028, 1036, 1037, 108 L.Ed.2d 178 (1990) (applying test where the prisoner's lib-

erty interest—"avoiding the unwanted administration of antipsychotic drugs"—was less than fundamental, and stating that the test applies *"even when* the constitutional right claimed to have been infringed *is fundamental,* and the State under other circumstances would have been required to satisfy a more rigorous standard of review" (emphasis added)).

3. In *Hudson v. Palmer,* 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984), the Supreme Court held "that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches *does not apply* within the confines of the prison cell." The right to maintain the confidentiality of medical information is sufficiently distinct from the right to privacy protected by the Fourth Amendment such that the Supreme Court's holding in *Hudson v. Palmer* has no bearing on this case.

measure even though it incidentally and necessarily effects disclosure. *See, e.g., Moore v. Mabus,* 976 F.2d 268, 271 (5th Cir.1992); *Harris v. Thigpen,* 941 F.2d 1495, 1521 (11th Cir.1991). And the Seventh Circuit has held that the constitutional rights of an HIV-positive inmate are not infringed when prison officials undertake to warn prison officials and inmates who otherwise may be exposed to contagion, even if those warnings are administered on an ad hoc basis. *See Anderson v. Romero,* 72 F.3d 518, 525 (7th Cir.1995).

It is harder to think of circumstances in which the disclosure of an inmate's transsexualism—a condition which (obviously) is not contagious—serves legitimate penological interests, especially given that, in the sexually charged atmosphere of most prison settings, such disclosure might lead to inmate-on-inmate violence. *Cf. Farmer v. Brennan,* 511 U.S. 825, 849, 114 S.Ct. 1970, 1985, 128 L.Ed.2d 811 (1994). We do not suggest that a prison official's disclosure of an inmate's transsexualism—or, for that matter, the failure of a prison official to help a prisoner conceal her transsexualism where that condition is easily discernable—cannot in some circumstances be viewed as reasonably related to legitimate penological concerns. But in this case, no legitimate penological concern has been posited, nor do the facts lend themselves to such an inference.

### 3. Qualified Immunity

Schriver maintains that irrespective of whether Devilla had a right to confidentiality and apart from whether the jury's verdict was inconsistent (as the district court found), the verdict in Schriver's favor should be affirmed by the doctrine of qualified immunity.

■ A preliminary issue is Devilla's assertion that immunity has been waived. Devilla argues that because Schriver did not file a cross-notice of appeal, she cannot seek affirmance on the basis of a legal argument—immunity—that was rejected by the district court. The argument is meritless. The judgment entered was entirely in Schriver's favor. It is "settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it." *International Ore & Fertilizer Corp. v. SGS Control Servs., Inc.,* 38 F.3d 1279, 1285 (2d Cir.1994) (quoting *United States v. American Ry. Express Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 563–64, 68 L.Ed. 1087 (1924)).

■ The doctrine of qualified immunity "shields government officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rodriguez v. Phillips,* 66 F.3d 470, 475 (2d Cir.1995) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In determining whether a particular legal principle was "clearly established" for purposes of qualified immunity, this Court has considered three factors: "'whether the right was defined with reasonable specificity; whether the decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful.'" *Horne v. Coughlin,* 155 F.3d 26, 29 (2d Cir.1998) (quoting *Rodriguez,* 66 F.3d at 476). Consideration of these factors demonstrates that the right of a prisoner to maintain the privacy of medical information was not clearly established on December 31, 1991—the date of Lynch's disclosure.

This Court's controlling precedent on the right to maintain the confidentiality of medical information issued in 1994 with the holding in *Doe v. City of New York,* 15 F.3d 264 (2d Cir.1994), and even so, that

case did not address the applicability of that right to prison inmates. As of 1991, our sister circuits were in disagreement or noncommittal on the question decided in *Doe*. Compare, e.g., *Harris*, 941 F.2d at 1513 (11th Cir.1991) ("We ... believe and assume *arguendo* that seropositive prisoners enjoy some significant constitutionally-protected privacy interest in preventing the non-consensual disclosure of their HIV-positive diagnoses to other inmates, as well as to their families and other outside visitors to the facilities in question."), with *J.P. v. De Santi*, 653 F.2d 1080, 1090 (6th Cir.1981) ("[T]he Constitution does not encompass a general right to nondisclosure of private information." (emphasis added)), with *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir.1980) (recognizing, in a nonprison context, the right to maintain the confidentiality of one's medical history). Devilla has cited to us no pre–1992 appellate case (and we have found none) holding that this right to confidentiality exists in the prison environment. *Accord Anderson*, 72 F.3d at 523 (stating, in 1995, that there existed no "appellate holding that prisoners have a constitutional right to the confidentiality of their medical records").

It cannot be said that at the time of Lynch's disclosure, Devilla's right to maintain the confidentiality of her HIV-positive status and transsexualism was clearly established.[4] We therefore affirm the entry of judgment in Schriver's favor on Devilla's right to privacy claim and do not reach Devilla's claim that the court erred by refusing to dismiss a prospective juror for cause.

## B. The Eighth Amendment Claim

■ The district court dismissed Devilla's Eighth Amendment claim on the ground of qualified immunity, reasoning that "it was not clearly established as of

this incident in 1991 that a corrections officer could be liable for an Eighth Amendment claim in committing such an unauthorized disclosure of personal medical information." We disagree.

In order to overcome a defendant's assertion of qualified immunity, a § 1983 plaintiff must demonstrate that at the time of the violation, the contours of the allegedly violated right were "sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.* Rather, the unlawfulness must be apparent "in the light of pre-existing law." *Id.*

By December of 1991, a reasonable prison official would have known that under the Eighth Amendment he could not remain deliberately indifferent to the possibility that one of his charges might suffer violence at the hands of fellow inmates. In August 1991, we considered an inmate's claim under the Eighth Amendment that prison officials failed to protect him from assault by other inmates, and concluded:

> Imprisoning a guilty defendant serves a number of penological purposes amongst which is administering just punishment. But once incarcerated, protecting the guilty defendant from inmates' violence ordinarily involves no competing penological policies. In fact, taking measures to ensure inmates' safety aids in the maintenance of order in prison. Hence, an inmate's claim that prison officials failed, as a result of their deliberate indifference, to protect him from the violent actions of other inmates may state a viable § 1983 cause of action.

4. In *Doe v. Marsh*, 105 F.3d 106, 110 (2d Cir.1997), we "assume[d], without deciding, ... that ... in September 1992 there existed a clearly established constitutional, confiden-

tiality-based right to privacy which precluded the state from disclosing that the [non-prisoner] plaintiffs were persons with HIV."

*Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991); *see also Al–Jundi v. Mancusi,* 926 F.2d 235, 240 (2d Cir.1991) (denying qualified immunity defense where prisoners alleged that prison officials, in violation of the Eighth Amendment, condoned brutal reprisals against them after prison was retaken from rioting inmates).

In our view, it was as obvious in 1991 as it is now that under certain circumstances the disclosure of an inmate's HIV-positive status and—perhaps more so—her transsexualism could place that inmate in harm's way. Accordingly, we hold that "under preexisting law," a reasonable prison official in December of 1991 would have known that such disclosure, under certain circumstances and absent legitimate penological purposes, could constitute deliberate indifference to a substantial risk that such inmate would suffer serious harm at the hands of other inmates. *Cf. Anderson,* 72 F.3d at 523 (stating that prison employees would violate an inmate's Eighth Amendment rights if, "knowing that an inmate identified as HIV positive was a likely target of violence by other inmates yet indifferent to his fate, gratuitously revealed his HIV status to other inmates and a violent attack upon him ensued"). We therefore reverse the district court's ruling, with respect to Devilla's Eighth Amendment claim, that the defendants were protected from liability by the doctrine of qualified immunity. We remand this sole remaining claim to the district court. Because the basis for remand is an analytical flaw at a threshold point in the district court's reasoning, we express no view as to whether the defendants enjoy qualified immunity on some other ground or whether Devilla's allegations state a claim under the Eighth Amendment. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 835–48, 114 S.Ct. 1970, 1977–84, 128 L.Ed.2d 811 (1994); *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992).

## CONCLUSION

With respect to Devilla's right to privacy claim, we affirm the entry of judgment in Schriver's favor. As to Devilla's Eighth Amendment claim, we vacate the judgment in favor of defendants, and remand for further proceedings consistent with our opinion. We also vacate the court's order denying an award of attorney's fees, which was predicated on the court's conclusion that Devilla was not a prevailing party, a determination that cannot yet be made.