GARTH, Circuit Judge,
dissenting and concurring.
I agree with Judge Roth that the District Court’s decision dismissing Doe’s complaint should be affirmed because the defendants have qualified immunity from Doe’s claims. However, I cannot agree that, on this record brought before us on a Rule 12(b)(6) motion,[1] we can or should declare that “a constitutional right to privacy in one’s medical information exists in prison.” (Roth Op. at 317.) This case is one of first impression, and Judge Roth’s holding, with which Judge Nygaard concurs as to the constitutional right,[2] may have a multitude of ramifications in this Circuit where major prisons abound. It is for that reason that I write separately contesting the creation of a constitutional right of privacy and confidentiality for prisoners.[3]
It is true that, in so holding, Judge Roth qualifies this statement, observing that “Doe’s constitutional right is subject to substantial restrictions and limitations in order for correctional officers to achieve *324 legitimate correctional goals and maintain institutional security.” (Roth Op. at 317.) Nevertheless, because she and I agree that such a constitutional right of privacy in prison has not been and is not clearly established, the prudential and wiser course of action in this ease is to decline to determine that such a constitutional right has been established at all.
I.
The record before us in this case is naked of anything other than Doe’s allegations in his complaint — allegations which complain of a lack of privacy and confidentiality as well as a violation of his grievance/appeal rights.[4] However, we have not been informed and do not know whether Doe, who was a death penalty prisoner, was required to be closely guarded at all times by prison guards, thereby virtually ensuring that the guards would be privy even to private conversations. We do not know the construction and dimensions of the medical area or medication dispensary at SCI-Pittsburgh — whether there are communal examination rooms or private examination cubicles. W e do not know the location of Doe’s death penalty cell in the Restricted Housing Unit (“RHU”), or the route, access, and distance from his cell to the medical area. We do not know the circumstances under which medication is dispensed at sick call — the structure and configuration of the dispensary, the location in the dispensary of physicians, nurses, guards, and other prisoners, or the manner in which prisoners receive medication (are they separately scheduled or are they scheduled in a group or in an open line?). Nor do we know the administrative complexities encountered by prison authorities in ensuring the manner in which each prisoner receives the correct medication. We do not know the state of the security precautions in the dispensary area as compared to the security in the RHU, nor do we know the required provisions for security in the passageways between the two areas.
All that we do know from Doe’s complaint is 1) that the clinic door is kept open *325 when Doe is seen by doctors and CDC specialists so that Doe may be viewed by corrections officers,[5] and 2) that, when Doe receives his medication, the medication is sometimes referred to by name. Moreover, because, on a Rule 12(b)(6) motion, no response or information is available from, in this case, the prison authorities, we have no knowledge of the physical, structural, or security conditions in prison that contribute to and may generate a diminished expectation of privacy or confidentiality.[6]
Prisons are communal environments in which a large number of inmates and prison employees coexist in a confined living space. For this reason, inmates have little physical privacy, and the circumstances of medical treatment may not conform to private, non-prison norms. Prisoners must do everything in close proximity to other inmates and prison personnel, including sleeping, eating, dressing, bathing, and, to a certain extent, receiving medical attention.
II.
Another reality of prison life is the fact that prison resources are limited. Prison systems are generally in this day and age overcrowded and understaffed. Therefore, accommodation of prisoners’ privacy and confidentiality demands, their needs, and even their rights cannot be assumed or declared in a vacuum. Considering the communal nature of prison existence, similar in many privacy (or lack of privacy) aspects to life in the military, together with the limited and often insufficient— financial resources of prisons, I believe it to be rash and imprudent to hold at this time, without much more information about prison security concerns, that Doe has a constitutional right to privacy in his HIV-positive status, any more than he has a constitutional right of privacy in his cell. See Hudson v. Palmer, 468 U.S. 517, 525-26, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).
I recognize, of course, that the rationale of Hudson, analyzed under the Fourth Amendment, dealt with the lack of privacy an inmate has in his cell accommodation, whereas here our attention is drawn to rights under the Fourteenth Amendment and the “penumbras” of rights encompassing privacy. See Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 *326 L.Ed.2d 510 (1965) (holding that “specific guarantees in the Bill of Rights have penumbras,” one of which is the right of privacy). However, certainly Doe’s expectation of privacy and confidentiality of medical information in a communal dispensary setting cannot be deemed to be greater than his expectation of privacy in his cell, depending, of course, on all of the circumstances which I have noted above and as to which we have no information.
Indeed, I take issue with Judge Roth’s assertion that “Doe’s asserted right to privacy in his medical information is completely different than the right extinguished in Hudson.” (Roth Op. at 316.) After all, in Hudson, the Supreme Court declined to declare a constitutional right because “[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions,” 468 U.S. at 526, 104 S.Ct. 3194, whereas, here, Judge Roth has declared a constitutional right, but has held that “Doe’s constitutional right is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security.” (Roth Op. at 317.) If there are concerns, as evidently Judge Roth has here, that- “legitimate correctional goals” and “institutional security” may be jeopardized by the exercise of Doe’s purported constitutional right, it would seem to me only prudent that we should withhold declaring a constitutional right of privacy until we have obtained the information we lack.
That is the course of action that the Supreme Court took in Hudson, where the Court decided the very limited question of a prisoner’s Fourth Amendment privacy right in his cell on an appeal from a grant of summary judgment, not a Federal Rule of Civil Procedure 12(b)(6) motion, and even Powell v. Schriver, 175 F.3d 107 (2d Cir.1999), which Judge Roth cites in support of her declared constitutional right, went to full trial before the Second Circuit announced that a constitutional right had been established.
I believe that we can analogize Doe’s situation to the Supreme Court’s rationale in Hudson, where the Court, as noted, held that prisoners do not have a Fourth Amendment right to privacy in their cells. Doe’s complaint includes claims of violation of his privacy, violation of confidentiality, and violation of his rights under the grievances and appeal procedures. My reading of Doe’s complaint reveals that it is the privacy aspect on which Doe has focused and which has caused his distress. But, the question that then arises is whether Doe had a legitimate expectation of privacy concerning his HIV-positive status. In this respect, I believe we can look to Hudson, where the Court stated:
Determining whether an expectation of privacy is “legitimate” or “reasonable” necessarily entails a balancing of interests. The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances: A prison “shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." We strike the balance in favor of institutional security, which we have noted is “central to all other corrections goals.” A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner’s expectation of privacy always yield *327 to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that “[l]oss of freedom of choice and privacy are inherent incidents of confinement.”
Hudson, 468 U.S. at 527-28, 104 S.Ct. 3194 (internal citations omitted) (emphasis added). So too is the privacy interest implicated in this case “limited by the exigencies of the circumstances,” namely the communal nature of prison life, the logistical problems with prisoner confidentiality in prison medical facilities, and the need for prisoners, especially death row prisoners such as Doe, to be watched closely by prison guards. Therefor e, I believe that, depending upon the prison information as to which we are still ignorant, Doe’s right to privacy in the communication of his medical information may be “fundamentally incompatible with the close and continual surveillance of inmates” as was the Fourth Amendment right in Hudson.[7] See Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (“challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law”).
Thus, the realities of prison life compel a holding that Doe has not established a constitutional right to privacy on the record here — and certainly not in the current posture of this case. Though the Supreme Court has held that prisoners retain “those [constitutional] rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration,” Hudson v. Palmer, 468 U.S. 517, 523, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court has also observed repeatedly that “[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.”[8] Price v. Johnston, *328 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). These “considerations” include “deterrence of crime, rehabilitation of prisoners, and institutional security,” DeHart v. Horn, 227 F.3d 47, 50 (3d Cir.2000), as well as, I believe, allocation of limited prison resources. Indeed, the Supreme Court has stated: “because the ‘problems of prisons in America are complex and intractable,’ and because courts are particularly ‘ill equipped’ to deal with these problems, we generally have deferred to the judgments of prison officials in upholding these regulations against constitutional challenge.” Shaw v. Murphy, 532 U.S. 223, 121 S.Ct. 1475, 1480, 149 L.Ed.2d 420 (2001) (internal citations omitted) (holding that a prisoner has no First Amendment right to provide legal assistance to other inmates and that, therefore, prison officials did not violate the prisoner’s constitutional rights when they intercepted a letter containing legal advice that he sent to another prisoner).
III.
I also note that a decision in this case that 1) the record is not sufficient to establish a constitutional right but that 2) the right was not clearly established in any event is consistent with the Supreme Court’s directive in Wilson v. Layne, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). In Wilson, the Court stated that “[a] court' evaluating a claim of qualified immunity ‘must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.’ ” 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)). The Court explained that “[deciding the constitutional question before addressing the qualified immunity question ... promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public.” 526 U.S. at 609, 119 S.Ct. 1692.
However, Wilson arose in the context of a district court’s ruling on a summary judgment motion, not on a Rule 12(b)(6) motion to dismiss, as did the other cases cited by the Court in Wilson. See Conn v. Gabbert, 526 U.S. 286, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); see also Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).[9] This doctrine makes sense in the context of a summary judgment motion, which occurs at the close of discovery when a court may make a decision on the existence of a constitutional right with the benefit of the relevant facts.
Hence, it seems to me that the Wilson rule is not appropriately extended to rulings on Rule 12(b)(6) motions to dismiss, where the factual record is as scant as it is here. In my opinion, to construct a constitutional right out of the whole cloth without analysis and without any knowledge of the institutional factors or security concerns attendant to a prison population or to a penal environment appears to me to be not only improvident but, as I have stated, rash. Indeed, I find it highly unusual that a court should decide the existence of a constitutional right when it has *329 essentially no record before it and no basis on which it may balance the claims made by the prisoner of privacy expectations against legitimate security interests of the prison. Such a decision does not “pro-motet ] clarity in the legal standards for official conduct, to the benefit of both the officers and the general public,” Wilson, 526 U.S. at 609, 119 S.Ct. 1692, but instead causes uncertainty and confusion by establishing an hitherto undeclared constitutional right with no discernable standards.
Judge Roth in her majority opinion has responded to this critique and my thesis by citing two Supreme Court cases and declaring that the Supreme Court unequivocally demands that, in qualified immunity cases, the constitutional right first be declared before we address whether that right has been clearly established. (Roth Op. at 315 n. 4.) I quite agree with her that the doctrine she invokes requires the declaration of a constitutional right as the first order of business. However, and this is a major “however,” those cases to which she refers were not cases decided by a district court on a Rule 12(b)(6) motion. See Wilson v. Layne, 526 U.S. 603, 608, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (“The District Court denied respondents’ motion for summary judgment on the basis of qualified immunity.”); Conn v. Gabbert, 526 U.S. 286, 289, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (“[Defendants] moved for summary judgment on the basis of qualified immunity, and the District Court granted the motion.”). The very nature of a Rule 12(b)(6) motion, as contrasted with a summary judgment motion, with its concomitant standard of review (accepting all of the plaintiffs allegations as true), is alien to certain types of judicial declarations (namely, declarations of constitutional rights).
The Seventh Circuit, albeit in a different context, has recently held that district court judges should not apply the Rule 12(b)(6) standard of accepting a plaintiffs allegations as true when they determine whether to certify a class. The Seventh Circuit instructed that, “[b]efore deciding whether to allow a case to proceed as a class action, ... a judge should make' whatever factual and legal inquiries ar e necessary under Rule 23.” Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir.2001). Similarly, I suggest that the Rule 12(b)(6) standard cannot be applied by district courts in first determining the existence of a constitutional right, because the facts and circumstances of the case, as they bear upon penological interests and concerns, must be explored before a court can unequivocally announce a constitutional right.
Moreover, I have great difficulty, as I envisage the bench and bar will also have, in identifying the contours and parameters of an asserted constitutional right of prison privacy that is still subject to the restrictions and limitations of penal security interests. Even Judge Roth admits that these restrictions, limitations, and accommodations have yet to be delineated. In particular, since the relevant penological interests are presently not known and may, by their very nature, cause the constitutional right at issue here to disappear into thin air or be diminished to a point of nothingness, it seems to me far better that we know precisely the right with which we are dealing before creating such a right hable to be dismissed on its first documented challenge.
Certainly the Supreme Court could never have intended that a fundamental constitutional right be created with no regard for the framework or circumstances relevant to its application. It is for that reason, I suggest and strongly urge, that it is far more prudent and responsible to await the development of an appropriate record *330 before plunging ahead to create a fundamental right which may not ever be sustainable in a communal prison context.
Judge Roth acknowledges that the record in this case is undeveloped just as Doe himself “concedes that the ‘open door’ examination room policy [see note 3, supra] could conceivably be justified by a legitimate security interest but contends that no such interest has been advanced here.” (Roth Op. at 314.) Judge Roth, recognizing that we would ordinarily remand for consideration by the trial court of issues concerning legitimate penological interests, security concerns, costs of accommodating Doe’s privacy interest, availability of alternatives, etc., did not take that course because the right which she has declared was not clearly established.
I would hold that, if a record is undeveloped, as this one is, it cannot suffice to form the basis for the declaration of a constitutional right. The announcement of a constitutional right — an announcement which is never lightly reached and which inevitably has far — reaching and unpredictable consequences — should be grounded on unassailable legal principles and formulated based on a full factual record. Had Judge Roth just assumed arguendo that a constitutional right existed in prison, as the Eleventh Circuit did in Harris v. Thigpen, 941 F.2d 1495, 1513 (11th Cir.1991), (which was admittedly decided before the Supreme Court’s holding in Wilson v. Layne, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)), while I would have been uncomfortable, I would not have resisted her announcement as I have. But, to announce without reservation a fall-fledged constitutional right of privacy in prison, as a matter of first impression, without a factual record, and without any substantial or persuasive case support, I believe transcends our role as reviewing judges. I think the declaration made in this case is wrong and is a grave mistake to publish as this Circuit’s precedent. I think that we will ultimately find it necessary to retreat from the constitutional position this panel has taken.
IY.
Accordingly, in my opinion, we are correct in disposing of this case on qualified immunity grounds, not only because the constitutional right was not clearly established but because, at this time and in the posture of the present case, we should not announce a constitutional right which cannot be defined at this stage of the proceedings.
I therefore respectfully dissent firom Judge Roth’s constitutional holding but concur in the final judgment, because I agree with Judge Roth that such a right has not been, and is not, clearly established and that, therefore, the District Court’s dismissal of Doe’s action should be affirmed.

. A motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6) is granted only if: "taking the allegations of the complaint as true, ... and viewing them liberally giving plaintiffs the benefit of all inferences which fairly may be drawn therefrom, ... 'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.' " Bogosian v. Gulf Oil Corp., 561 F.2d 434, 444 (3d Cir.1977) (internal citations omitted).

. For ease of reference, I will refer to Judge Roth's holding throughout this dissent and concurrence, although Judge Nygaard constitutes her majority with respect to the establishment of a constitutional right to privacy in prison.

. In her footnote 3, relevant to her discussion of mootness, (see Roth Op., Part III.A), Judge Roth asserts that § 1997e(e) of the Prison Litigation Reform Act ("PLRA") does not bar claims for punitive damages, relying on Allah v. Al Hafeez, 226 F.3d 247, 251 (3d Cir.2000). I disagree with her analysis, because I believe that this case is far more similar to Davis v. District of Columbia, 158 F.3d 1342 (D.C.Cir.1998), where the D.C. Circuit held that an inmate's punitive damages claims were barred by the PLRA. We distinguished Davis in Allah "because those claims [in Davis] stemmed from the allegations of emotional and mental injury [suffered as a result of the violation of Davis' constitutional right to privacy].” 226 F.3d at 252. As a consequence, contrary to Judge Roth, I would hold that Doe’s punitive damages claim is barred by the PLRA, although I agree that the claim for nominal damages prevents our dismissing Doe’s action as moot.

. That statement of Doe's claim alleges:
• Doe is a death row prisoner;
• After submitting to a blood test, Doe was informed by the prison medical staff that he was HIV-positive and that this medical condition would be kept confidential;
• He has undergone medical examinations and tests in the open presence of correctional officers and other inmates;
• The clinic door is kept open when Doe is seen by doctors and specialists from the Centers for Disease Control (CDC), so that correctional officers can see Doe;
• When Doe has an appointment with a CDC specialist, the correctional officers who escort him to the appointment are informed of the nature of the appointment;
• On one occasion, a nurse announced aloud the names of the medications being delivered to Doe in the presence of other inmates and that nurse told a corrections officer about Doe’s condition;
• In connection with Doe’s internal grievance about the sick call procedure, he was interviewed by a medical grievance officer whom Doe told that another inmate twice over heard a nurse stating the name of Doe’s medication when delivering it to him;
• Doe’s internal grievance, which contained information about his HIV-positive status, was forwarded to the superintendent of the prison;
• Prison officials responded to Doe’s internal grievance by informing him that the nurses denied his allegations and that the door had to be left open when Doe was being examined by specialists and doctors due to a "security issue”; and
• His appeal rights had been affected by being obliged to go through the superintendent prior to appeal to final review.
(App.l5a-19a.)

. Judge Roth acknowledges that Doe has conceded that this practice may be justified by the prison's legitimate security concerns. (Roth Op. at 317.)

. Because, as noted, this is an appeal from a Rule 12(b)(6) dismissal, the defendants have not been able to inform us of their actions, procedures, regulations, explanations, or justifications in response to Doe's complaint. (See text infra, discussing the inadvisability of creating constitutional rights based on a naked record consisting only of the prisoner-plaintiff's allegations.) It is not only impossible to analyze the factors identified in Turner (connection between regulation and justification; alternative means of exercising right; costs of accommodating right; and alternatives to the regulation), as even Judge Roth acknowledges (see Roth Op. at 317 ("defendants did not have the opportunity to [produce] any evidence of legitimate penological interests, costs ..., or availability of alternatives ...")), but it is similarly hopeless to draw upon instruction from the "privacy?” cases cited by both Judge Roth and Judge Nygaard. This is so because, here, there are no factual circumstances that can be likened or compared to the circumstances described in the cases my colleagues have cited, almost all of which are non-prison cases or are inapposite for some other reason and, therefore, are not relevant in any event. See, e.g., Doe v. Southeastern Pennsylvania Transp. Auth., 72 F.3d 1133 (3d Cir.1995) (non-prison case); United States v. Westinghouse Elec. Corp., 638 F.2d 570 (3d Cir.1980) (non-prison case); Moore v. Mabus, 976 F.2d 268 (5th Cir.1992) (does not establish privacy right); Harris v. Thigpen, 941 F.2d 1495 (11th Cir.1991) (does not establish privacy right).

. I should note that the connection between the prison’s security interest and the deprivation of Doe's right to privacy is less direct here than in the Fourth Amendment context. In Hudson, the Supreme Court observed that prison officials must be able to maintain prison safety by entering inmate’s cells to search for weapons and contraband. Here, Doe's right to privacy is overshadowed and diminished by the general need to monitor and guard prisoners and by the very nature of a forced communal living environment, both of which make it difficult to preserve a prisoner's privacy.
Moreover, I believe that the balancing of interests prescribed by the Supreme Court in Hudson whereby expectations of privacy must be balanced against legitimate penological and security interests cannot be undertaken unless and until those interests are known and spread upon the record. Until that time, I cannot subscribe to or hold that prisoners have the same privacy interests as the general non-prison population enjoys. I also believe that, when the balancing equation is completed, it will weigh in favor of institutional security and against prisoners’ unrealistic expectations of privacy as it does in the Fourth Amendment context.
Hence, I am neither influenced nor persuaded by Judge Roth’s reliance on Powell v. Schriver, 175 F.3d 107 (2d Cir.1999), a Second Circuit case not binding in this Circuit and completely distinguishable because: 1) Powell was decided only after a full jury trial, whereas here we have a Rule 12(b)(6) motion which takes the allegations of the complaint as true, see note 1, supra; 2) Powell extrapolated its privacy holding from Doe v. City of New York, 15 F.3d 264 (2d Cir.1994), which is a non-prison case of privacy; and 3) Powell's emphasis was wholly on transsexualism — a condition with its unique problems not relevant in Doe’s case.

. The Supreme Court reaffirmed this principle most recently in Shaw v. Murphy, stating that "constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large.” 532 U.S. 223, 121 S.Ct. 1475, 1479, 149 L.Ed.2d 420 (2001).

. Powell v. Schriver, see note 5, supra, in which the Second Circuit held that a transsexual prisoner had a constitutional right to privacy in that medical information but that the constitutional right to privacy in prison was not clearly established, arose in the context of a district court's grant of judgment notwithstanding the verdict to the defendant. In that case, unlike this one, the Second Circuit had the benefit of a full factual record after a full jury trial.