Caron **LABRECQUE**, Plaintiff

v.

**SODEXHO USA, INC.** and **Sodexho, Inc.,** Defendants.

No. CIV.A.02–30020–MAP.

United States District Court,
D. Massachusetts.

Oct. 17, 2003.

Hugh D. Heisler, Heisler, Feldman & McCormick, PC, Springfield, MA, for Caron Labrecque, Plaintiff.

Paul F. Beckwith, Cooley, Manion, Moore & Jones, PC, Harry L. Manion, III, Cooley, Manion, Moore & Jones LLP, Kenneth J. Martin, Cooley, Manion, Jones LLP, Boston, MA, for Sodexho USA, Inc, Defendants.

## MEMORANDUM REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 17)

PONSOR, District Judge.

### I. INTRODUCTION

Caron LaBrecque ("LaBrecque") has sued her former employer Sodexho USA, Inc. and Sodexho, Inc.[1] ("Sodexho") for failing to reasonably accommodate her disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112 ("ADA"). Defendant moved for summary judgment on the grounds that plaintiff was not disabled within the definition of the ADA, and also that plaintiff's resignation preempted its effort to reach a reasonable accommodation. On October 8, 2003, this court denied defendant's motion for summary judgment and issued a further scheduling order. This memorandum will set forth the court's reasons for its ruling.

### II. FACTS

In considering a motion for summary judgment, the court must view the facts in the light most favorable to the nonmovant, LaBrecque.

LaBrecque was involved in a car accident in 1991 and subsequently began to experience persistent pain throughout her body, limitations on the use of her arms, and constant headaches. She saw several doctors in connection with her condition before being diagnosed in 1993 with fibro-

---

1. Sodexho, Inc. is the successor to Sodexho USA, Inc., an entity that no longer exists.

myalgia by rheumatologist Dr. David J. Peirangelo. LaBrecque's primary care physician, Dr. Marci Yoss, also subsequently diagnosed LaBrecque with fibromyalgia.

Fibromyalgia is widely accepted in the medical community as a recognized, diagnosable syndrome, even if its etiology and process are not entirely understood. It is a complex illness manifested by the presentation of several symptoms occurring together, most notably, persistent pain throughout the body. Symptoms generally include muscle aches and pain, muscle tension, sleeplessness, fatigue, depression, headaches, mental confusion, forgetfulness, problems organizing thoughts and speech, and irritable bowel. The severity of pain and other symptoms associated with fibromyalgia are highly individualized and may fluctuate depending upon a variety of factors; it rarely subsides entirely. Pain and other symptoms of fibromyalgia can be exacerbated by excessive physical activity and increased levels of stress, anxiety, tension, and depression. Such flare-ups often substantially inhibit the ability of fibromyalgia sufferers to work, walk, run, lift objects, perform ordinary household functions and yardwork, and care for themselves. As a result, many people diagnosed with fibromyalgia are unable to maintain gainful employment. It is a longterm and usually permanent condition for which there is no known cure. Treatments generally include: medications for pain and muscle tension; medication, counseling, and therapy for depression; physical therapy and certain prescribed exercises; trigger-point injections; vitamin therapies; and ultrasound.

LaBrecque manifests several symptoms of fibromyalgia. The most prominent of these are: pain in her neck, back, shoulders, legs, and feet; depression; irritable bowel and intestinal problems; sleepless-

ness; frequent severe headaches; mental confusion and disorientation; and ailments and injuries that do not heal promptly and recur with unusual frequency. These symptoms become more severe under certain circumstances, including: over-exertion; sitting or standing in one place for too long; working for too many hours; lifting heavy objects; lifting any objects above shoulder level; pushing, pulling, or repetitive motion; action requiring fine motor skills; sleeplessness; dietary changes; and increased stress or anxiety.

LaBrecque's fibromyalgia flares up approximately three to four times per month, and each flare-up lasts approximately two to four days. During such periods, LaBrecque may experience unbearable pain that makes sitting or standing in place for even a short time extremely painful. Simple manual tasks such as brushing her hair, turning pages in a book, doing the dishes, carrying even small amounts of laundry, lifting her arms above her shoulders, and tying her shoes become at these times difficult or even impossible. LaBrecque's primary recourse during such flare-ups is to move around in a slow and deliberate manner, and lie down for brief periods in a comfortable position. Medication, the application of heat to particularly painful areas of her body, stretching, and gentle exercises also sometimes help to diminish the pain.

Even when she is not experiencing debilitating flare-ups, LaBrecque's fibromyalgia restricts her ability to perform a broad range of activities in the course of her daily life. She is unable to sit for more than one or two hours in any twenty-four hour period, and she cannot stand continuously for more than two to four hours at a time or more than a total of four to six hours in any twenty-four hour period. She also cannot perform manual tasks that involve pushing, pulling, lifting

objects weighing more than twenty pounds, raising her arms for periods of time, climbing, fine motor skills, repetitive motions, or vibrations. In turn, these physical restrictions limit LaBrecque's ability to engage in routine daily activities such as turning pages in a book, screwing in a light bulb, raking leaves, mowing the lawn, doing laundry, taking out the trash, climbing a ladder, putting away groceries, exercising, or engaging in athletic activities. Also, the mental confusion associated with fibromyalgia prevents LaBrecque from concentrating in a manner that would allow her to engage in educational pursuits or learn new information.

LaBrecque graduated from high school in 1978 and attended a six-month course in data entry at the Business Education Institute in West Springfield, Massachusetts in 1982. She has no other formal education. She worked as an assembler for a company called Preferred Electronics for approximately three and a half years following her graduation from high school, and she also has worked at various jobs in two department stores and three restaurants.

LaBrecque was out of work for three years following the 1991 car accident that triggered her fibromyalgia. In 1994 she returned to work, and in September of 1995, she began working for Sodexho. Sodexho provides food and management services to businesses, hospitals, and schools throughout the United States. In particular, Sodexho operates a number of fast food restaurants on the campus of Westfield State College, including a Corner Café, a Taco Bell, and a Subway. Sodexho initially employed LaBrecque as a cook at its central facility on that campus, and she eventually began working as a cook/cashier at the Corner Café, a job that required that she stay at the cash register continuously for two to three and a half hours during lunchtime.

The sedentariness of the cook/cashier position exacerbated her fibromyalgia, and LaBrecque informed her supervisors of her condition. They accommodated her by periodically allowing her to take a break and walk around, lessening (but not eliminating) the severity of LaBrecque's fibromyalgia. In September 1996, she was promoted to the position of shift supervisor at Taco Bell, where she worked a regular eight-hour shift five days per week and was afforded a full range of physical motion without overtaxing her body. As a result, her fibromyalgia was manageable while she was a shift supervisor at Taco Bell.

In December, 1998, LaBrecque was transferred to the position of supervisor/cashier at Subway, and her schedule was altered. The reasons for her transfer are unclear. LaBrecque's total weekly hours were reduced from forty to thirty-three and a half. Most significantly, she was scheduled to work two back-to-back shifts of twelve to thirteen hours each, as well as two shorter shifts of five and four and a half hours each.[2] Her new position and new schedule were to take effect on January 21, 1999. Recognizing that she could not endure the lengthy back-to-back shifts without exacerbating her fibromyalgia, LaBrecque contacted Dr. Yoss, who advised her not to accept the new schedule. Doctor Yoss provided LaBrecque with a brief note dated January 12, 1999, stating that LaBrecque "suffers from fibromyalgia and is unable to work shifts

---

2. Most specifically, LaBrecque was scheduled to work the following hours at Subway: 5 P.M. to 10 P.M. on Thursday, 7 P.M. to 11:30 P.M. on Friday, 11 A.M. to midnight on Saturday, and noon to midnight on Sunday.

longer than 8 hours because of health reasons."

Also on January 12, LaBrecque contacted her supervisor, Michael Maselek, and requested that the new schedule be revised to accommodate the physical limitations presented by her fibromyalgia; rather than the back-to-back shifts, LaBrecque expressed her willingness to work regular eight hour shifts as she had done at Taco Bell. LaBrecque informed Maselek of her note from Yoss, and he did not ask to see it. He told LaBrecque that he did not know what he could do about her situation, and that he would get back to her.

On January 14, Maselek asked LaBrecque to work a twelve to thirteen hour shift at Subway on January 17, four days before the new schedule was to take effect. LaBrecque again noted her inability to work such a long shift because of her fibromyalgia, but indicated her willingness to work regular eight hour shifts. Maselek then suggested that if LaBrecque could not work the double shifts she could just work her two shorter scheduled shifts. LaBrecque pointed out that she could not afford to work only nine and a half hours per week and suffer the loss of her medical benefits. LaBrecque again offered to work regular eight hour shifts in lieu of her scheduled twelve and thirteen hour shifts. Maselek again told LaBrecque that he would get back to her about her schedule.

On January 19, LaBrecque received a message from Maselek on her answering machine in which he expressed his assumption that she had resigned because she failed to appear for her thirteen-hour shift on January 17. LaBrecque responded by leaving a message for Maselek indicating that she had not resigned and that she understood from their conversation on January 14 that she would not work on January 17 because she would be unable to

manage the lengthy shift due to her medical condition. On January 20, Maselek told LaBrecque that he would not modify her schedule and that she had only two choices: she could work all of her shifts according to the new schedule, including the two lengthy back-to-back shifts, for a total of thirty-three and a half hours per week, or she could work only the two shorter shifts for a total of nine and a half hours per week. LaBrecque initially agreed to work only the two shorter shifts, but changed her mind, concluding that such abbreviated hours would not allow her to earn a livable wage and would cause her to lose her medical benefits. She submitted her resignation to Maselek the next day, January 21.

After leaving Sodexho, LaBrecque worked for the Hampshire Community Action Commission, but ultimately lost that job because her fibromyalgia prevented her from attending an all-day training event. She then worked at Willard's Restaurant, but was forced to resign because the sedentary nature of the job exacerbated her fibromyalgia. LaBrecque now receives Social Security disability benefits.

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential to affect the outcome of the case. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All reasonable inferences that may be drawn from the record are to be con-

strued in the light most favorable to the part opposing summary judgment, *Motorsport Eng'n, Inc. v. Maserati SPA*, 316 F.3d 26, 28 (1st Cir.2002), and the moving party bears the initial burden of proving that no genuine issue of material fact exists. *Sands v. Ridefilm Corp.*, 212 F.3d 657, 661 (1st Cir.2000).

Nonetheless, "[t]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to survive a motion for summary judgment, a plaintiff alleging violation of the ADA must present a *prima facie* case of employment discrimination. *Rennie v. United Parcel Service*, 139 F.Supp.2d 159, 164 (D.Mass.2001); *see Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995).

## IV. *DISCUSSION*

■ LaBrecque's complaint is that Sodexho failed to reasonably accommodate her disability in accordance with its responsibility pursuant to the ADA. The ADA prohibits discrimination in employment against qualified persons with disabilities. 42 U.S.C. § 12112(a). Discrimination under this statute includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). To assert a claim of failure to accommodate pursuant to the ADA, LaBrecque must establish each of the following: (1) that she suffers from a "disability" within the meaning of the ADA; (2) that she is a qualified person who could perform the essential functions of the job with or without reasonable accommodation, and (3) that despite knowing of her disability, the employer failed to provide a reasonable accommodation.[3] *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir.2002); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir.1999). Each of these elements is addressed in turn.

### A. *Disability*

The ADA defines "disability" as either (1) a physical or mental impairment that substantially limits one or more of an individual's major life activities, (2) a record of such impairment, or (3) a perception of having such an impairment. *See* 42 U.S.C. § 12102(2). *See also*, 29 C.F.R. § 1630.2(g). LaBrecque claims to have a disability in the first category, *i.e.* a physical impairment, fibromyalgia, which substantially limits several of her major life activities. The activities include sitting, standing, thinking, learning, performing a wide range of manual tasks, and working.

■ Proper analysis of whether LaBrecque suffers from a disability within the meaning of the ADA requires three separate, yet related, inquiries: (1) whether LaBrecque suffered from a physical impairment; (2) whether the physical impairment limited any major life activity; and (3) whether the limitation was substantial. *See Bragdon v. Abbott*, 524 U.S.

---

**3.** Two other elements, sometimes noted, require no analysis. First, it is undisputed that Sodexho, a private employer with over fifteen employees, is subject to the ADA. Second, it is undisputed that the terms, conditions, or privileges of LaBrecque's employment were negatively affected.

624, 630–631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Carroll,* 294 F.3d at 238. These questions must be determined on an individualized, case-by-case basis. *See Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Carroll,* 294 F.3d at 238.

### 1. *Physical Impairment*

■ Sodexho does not contest La-Brecque's well supported assertion that she suffers from fibromyalgia and consequently is physically impaired to some degree. This portion of the analysis requires no more attention.

### 2. *Limitation on a Major Life Activity*

■ A "major life activity" is an activity "of central importance to most people's daily lives." *Toyota Motor,* 534 U.S. at 197, 122 S.Ct. 681. LaBrecque alleges that her fibromyalgia substantially limited the following major life activities: sitting and standing; thinking and learning; performing manual tasks requiring lifting, pushing, pulling, climbing, fine motor skills, or repetitive motion; and working. Some of these activities have been recognized as "major life activities," including sitting and standing, *Maziarka v. Mills Fleet Farm, Inc.,* 245 F.3d 675, 679 (8th Cir.2001), learning, *Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141, 155 (1st Cir.1998), and thinking, *Whitney v. Greenberg, Rosenblatt, Kull, & Bitsoli, P.C.,* 258 F.3d 30, 33 n. 4 (1st Cir.2001). *See also, Gillen v. Fallon Ambulance Service, Inc.,* 283 F.3d 11, 21 (1st Cir.2002) (lifting is a major life activity).

With regard to whether performing manual tasks and working constitute major life activities, however, the analytical picture is less clear. Noting that not every manual task qualifies as a "major life activity," the Supreme Court concluded that specific manual tasks themselves must be "of central importance to most people's daily lives" in order to be considered as a major life activity. *Toyota Motor,* 534 U.S. at 198, 122 S.Ct. 681. Moreover, "[o]ccupation-specific manual tasks may have only limited relevance to the manual task inquiry." *Toyota Motor,* 534 U.S. at 201, 122 S.Ct. 681. The Supreme Court has assumed that working may be a "major life activity" for purposes of the ADA, but "only '[i]f an individual is not substantially limited with respect to *any other* major life activity.'" *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139, citing 29 CFR § 1630.2(j) (emphasis in original); *See Toyota Motor,* 534 U.S. at 200, 122 S.Ct. 681 (2002).

In this case, any limitations on La-Brecque's ability to work derive from her incapacity to stand or sit, and so a determination as to her disability vis-a-vis her inability to stand or sit will be dispositive as to her disability vis-a-vis working. In other words, if LaBrecque is disabled with regard to the major life activities of sitting and standing, then *Sutton* counsels that the question of working be avoided. It is not necessary to address in any more detail the extent to which working constitutes a major life activity in the circumstances of this case.

On the facts of the record here, the court must conclude that the record demonstrates the existence of a physical impairment—fibromyalgia—which limits several well recognized major life activities, including sitting, standing, learning, and thinking. The final inquiry is whether any such limitation is substantial.

### 3. *Substantial Limitation*

■ A substantial limitation exists where the limitation is "'considerable' or

'specified' to a large degree," *Sutton,* 527 U.S. at 491, 119 S.Ct. 2139, but "should not be equated with 'utter inabilities.'" *Taylor v. Phoenixville Sch., Dist.,* 184 F.3d 296, 307 (3d Cir.1999). Regulations promulgated by the Equal Employment Opportunity Commission (EEOC) define "substantially limits" as:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which an average person can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Additionally, in determining whether an impairment substantially limits a major life activity, it is proper to consider the nature and severity of the impairment, the duration of the impairment, and the expected long-term impact of the impairment. *Toyota Motor,* 534 U.S. at 196, 122 S.Ct. 681; 29 C.F.R. § 1630.2(j)(2). Impairments that "interfere in only a minor way" with major life activities are not substantial. *Toyota Motor,* 534 U.S. at 197, 122 S.Ct. 681.

■ The legal analysis at this stage is rendered complex by the fact that fibromyalgia is highly individualized in its manifestations. It may disable one person but not another. The challenge of applying the law in this situation is well recognized. *See Maziarka,* 245 F.3d at 679 ("[A] conclusion that a certain condition ... does not substantially limit a particular plaintiff does not foreclose a determination that another individual with the same or analogous condition may be disabled within the meaning of the ADA.") As the Supreme Court has said, "[a]n individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." *Toyota Motor,* 534 U.S. at 199, 122 S.Ct. 681. Fibromyalgia is just such an impairment.

In general, unsupported self-serving statements by the plaintiff regarding the severity of a disability are insufficient to carry the day against a motion for summary judgment in an ADA case. However, in this case, LaBrecque's personal assertions are corroborated by medical records chronicling the physical limitations associated with her fibromyalgia, particularly with respect to sitting. This being so, the court must conclude that the record provides sufficient support for a reasonable jury's finding at least that plaintiff's fibromyalgia substantially limits her major life activity of sitting.

LaBrecque was diagnosed with fibromyalgia in 1993 by Dr. Peirangelo (a rheumatologist with extensive experience diagnosing and treating fibromyalgia) and in 1994 by Dr. Yoss (LaBrecque's primary care physician). Admittedly, Doctor Peirangelo's three examinations of LaBrecque in 1993 revealed no explicit finding of any limitations relating to her fibromyalgia. Doctor Yoss, however, treated LaBrecque regularly from 1994 through at least 2001, and repeatedly memorialized several physical limitations caused by her fibromyalgia.

As noted in the January 12, 1999 letter to Maselek, Dr. Yoss stated that LaBrecque "suffers from fibromyalgia and is unable to work shifts longer than 8 hours because of health reasons." In a thorough assessment of LaBrecque's condition dated August 23, 1999, Dr. Yoss noted specifically that "she is unable to sit for any extended period of time" and that "any repetitive activity is difficult," and more generally indicated the following physical limitations: (1) can stand for only 2–4 hours at a time and for only a total of 4–6 hours during an eight hour work day; (2) can sit for only

0–2 hours at a time and for only a total of 0–2 hours during an eight hour work day; (3) can lift or carry only up to 15 pounds frequently and 20 pounds occasionally; (4) cannot use her hands for pushing and pulling or for fine manipulation; (5) cannot use her feet for repetitive movements because sitting is a problem; (6) cannot climb at all, and can bend, squat, kneel, or reach only occasionally; and (7) can work only up to eight hours per day.

In separate letters dated November 20, 1999, and April 25, 2001, Dr. Yoss indicated that LaBrecque should be excused from jury duty because her fibromyalgia made it very difficult for her to sit for an extended period of time. On June 11, 2001, Dr. Yoss indicated that either standing or sitting for more than ten minutes caused increased discomfort, and that repetitive movements also caused discomfort. In an October 31, 2001 letter, Dr. Yoss indicated that LaBrecque should be excused from a workshop because "[s]he is unable to remain seated for more than a total of one to two hours in a 24 hour period." Finally, on December 13, 2001, Dr. Yoss's colleague, registered nurse Meg Breymann, indicated that LaBrecque could not sit or stand for more than ten minutes without moving, and also that repetitive movements exacerbated the symptoms of her fibromyalgia.

█ That most of these records arise after LaBrecque's employment with Sodexho ended does not require that they be disregarded for purposes of summary judgment. The record nowhere suggests that LaBrecque's condition changed significantly following her employment with Sodexho. A factfinder may well conclude that these records provide accurate evidence of plaintiff's condition *during* her employment with Sodexho. Taken together, these documents would allow a reasonable jury to find that her fibromyalgia

substantially limited her major life activity of sitting, and that she therefore suffered from a disability within the meaning of the ADA.

The depth and sufficiency of the medical records presented by LaBrecque distinguish this case from others in which courts have determined that a particular plaintiff's fibromyalgia did not substantially limit a major life activity. *See, e.g., Mincey v. Dow Chem. Co.,* 217 F.Supp.2d 737, 742 (M.D.La.2002) (fibromyalgia did not substantially limit major life activity where treating doctor indicated no limitations); *Kaley v. Icon Int'l Inc.,* 2001 WL 1781898, *6–*7 (S.D.Ind.2001) (lacking corroborative medical records, plaintiff's conclusory claim that fibromyalgia substantially limited major life activity not sufficient to create jury question); *Winn v. Runyon,* 1998 WL 565231, *6 (N.D.Ill.1998) (same).

In those cases, the record generally consisted simply of plaintiffs' own conclusory statements regarding the limitations imposed by the fibromyalgia. Without medical records to support the claimed limitations, summary judgment for the defendants was appropriate. In cases in which a plaintiff with fibromyalgia presented some medical support for the claimed disability, courts have allowed the claim to survive summary judgment. *See Alifano v. Merck & Co., Inc.,* 175 F.Supp.2d 792, 797 (2001)(medical records support claim of disability based on fibromyalgia); *Holt v. Olmsted Township Bd. of Trustees,* 43 F.Supp.2d 812, 822 (1998) (evidence of medication prescribed by doctors as treatment for fibromyalgia supports claim of disability).

Since a reasonable jury might conclude that LaBrecque's inability to sit as a result of her fibromyalgia constituted a disability within the meaning of the ADA, it is not necessary to address the possibility that other major life activities might be sub-

stantially limited as a result of plaintiff's fibromyalgia as well. LaBrecque has satisfied her burden with regard to presenting a jury question concerning whether she has a disability within the ADA. The next inquiry is whether LaBrecque was qualified to perform the essential functions of her job with or without a reasonable accommodation; *i.e.*, whether she was a qualified individual.

## B. *Qualified Individual*

■ Not surprisingly, Sodexho does not challenge LaBrecque's capacity to perform the essential functions of her job with or without a reasonable accommodation. Nothing in the record indicates either that LaBrecque was less than a satisfactory employee during her approximately four years with Sodexho, or that she was somehow incapable of performing the essential functions of the cashier/supervisor position at Subway. Plaintiff claims only that her disability rendered her unable to work back-to-back twelve and thirteen hour shifts—an arduous schedule even for someone with no disability—and there is no indication that such lengthy shifts were essential functions of the job. Indeed, the record suggests that only two other shifts on the Subway work schedule (out of approximately fifty-five total shifts) called for such lengthy hours. The rest of the shifts at Subway were for eight hours or less, and LaBrecque was willing to work for eight hours at a time.

The next inquiry is whether Sodexho offered LaBrecque a reasonable accommodation.

## C. *Reasonable Accommodation*

■ A reasonable accommodation may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position ... and other similar accommodations...." 42 U.S.C.

§ 12111(9)(B). Once an accommodation is requested, the employer and employee have a mutual obligation to engage in an interactive and communicative process to craft a solution to the work problem. *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir.2001), citing *Wynne v. Tufts Univ.*, 976 F.2d 791, 795 (1st Cir. 1992); *Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 648 n. 12 (1st Cir.2000), citing *Criado v. IBM Corp.*, 145 F.3d 437, 444 (1st Cir.1998).

Sodexho avers that it was prevented from offering LaBrecque a reasonable accommodation because she resigned on January 21, 1999, before the negotiating process had run its course. Taking the facts in the light most favorable to the plaintiff, however, a factfinder could conclude that defendant offered LaBrecque a classic Hobson's choice, and rejected any effort at a reasonable accommodation.

It cannot be disputed that LaBrecque clearly requested an accommodation on January 12, 1999, when she contacted Maselek and asked that, as an accommodation to her fibromyalgia, the new schedule be revised so that she would not be required to work more than eight hours in any shift. She requested such an accommodation on at least two subsequent occasions. Maselek's somewhat bizarre response to LaBrecque's first request for shorter hours was to ask her to work a twelve to thirteen hour shift on January 17. His obviously unworkable alternative was that plaintiff accept a regular schedule of only nine and a half hours per week. The record is then clear that on January 20 Maselek told LaBrecque he would *not* modify her schedule. She could "choose" to work only short shifts or a full schedule including the back-to-back twelve and thirteen hour shifts. It is true LaBrecque then resigned, but a reasonable jury could easily conclude that it was a resignation in name

only, and that she was forced to resign by Sodexho's failure to reasonably accommodate her disability.

## V. *CONCLUSION*

For the reasons set forth above, defendant's Motion for Summary Judgment has been denied. Further proceedings in the case will unfold in accordance with the schedule set by the court's order of October 8, 2003.

It is So Ordered.