STRAUB, Circuit Judge,
dissenting in part, concurring in part:
In finding that Matson has failed to state a viable claim of infringement of her privacy rights, the majority today gives the government substantial reign to publicly disseminate a person’s intimate medical information without any justification. While it is of course not the case that every bit of medical information is encompassed within the right to privacy, in my view, the majority has forged an unduly narrow understanding of what is protected. Because I believe that Matson’s allegations concerning defendants’ publication of her diagnosis of chronic fatigue syndrome (“CFS”) and/or fibromyalgia[1] suffice to state a privacy violation, I would reverse the decision of the District Court. Accordingly, I respectfully dissent. Given that I would reinstate Matson’s claim, I also briefly address Matson’s argument that defendant Board of Education of the City School District of New York (“BOE”) is a proper party to this suit and find that it is. I concur only in the majority’s con *70 elusion that Matson has failed to identify any conflict disqualifying the District Judge.
I. Right to Privacy
Grounded in substantive due process, it is well established that the Constitution protects a person’s privacy, including “the individual interest in avoiding disclosure of personal matters.” Whalen v. Roe, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In recognition of the fact that “[m]edical information in general ... is information of the most intimate kind,” O’Connor v. Pierson, 426 F.3d 187, 201 (2d Cir.2005), as part of the right to privacy, we have already “accorded constitutional stature to the right to maintain the confidentiality of previously undisclosed medical information,” Powell ex rel. Devilla v. Schriver, 175 F.3d 107, 112 (2d Cir.1999). Doe v. City of New York established that “the right to confidentiality includes the right to protection regarding information about the state of one’s health.” 15 F.3d 264, 267 (2d Cir.1994). “Extension of the right to confidentiality to personal medical information recognizes that there are few matters that are quite so personal as the status of one’s health, and few matters the dissemination of which one would prefer to maintain greater control over.” Id. Doe recognized that “[t]his would be true for any serious medical condition,” and that it certainly was true in the case of a person’s HIV status given that the disease is fatal and incurable and that those affected are often discriminated against. Id. Doe clearly did not set a baseline for the level of severity that a condition must reach for it to fall within the ambit of protected confidential information. Rather, as we subsequently explained, Doe “held that ‘individuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition’ because, as a more general matter, ‘the right to confidentiality includes the right to protection regarding information about the state of one’s health.’ ” O’Connor, 426 F.3d at 201 (internal brackets omitted) (quoting Doe, 15 F.3d at 267). “[T]hat the interest is at its zenith in the context (presented in Doe) of a person’s HIV status,” Powell, 175 F.3d at 111, does not imply that information regarding less serious conditions is unprotected; indeed, such a result would be directly contrary to Doe’s indication that privacy protection should extend to information concerning “any serious medical condition” that one might ordinarily like to keep private, Doe, 15 F.3d at 267. As a district court in this circuit has recognized in finding that the right to privacy encompasses information that a person has sickle cell anemia,
[wjithout establishing a minimum standard that individuals must meet who seek to invoke the right to privacy in medical information, Doe indicates that the constitutional right to privacy in one’s health protects information about “serious medical conditions,” especially those that are likely to provoke “not ... understanding or compassion but ... discrimination and intolerance.”
Fleming v. State Univ. of New York, 502 F.Supp.2d 324, 342 (E.D.N.Y.2007) (internal citation and brackets omitted).
Later decisions do not raise the bar. In Powell we recognized a right to confidentiality in transsexualism, a condition which we believed to be, akin to HIV, “the unusual condition that is likely to provoke both an intense desire to preserve one’s medical confidentiality, as well as hostility and intolerance from others.” 175 F.3d at 111. As such, we found that the “interest in privacy” concerning one’s transsexualism, “like the privacy interest of persons who are HIV positive, is particularly compelling.” Id. Powell thus suggests that one’s transsexualism is a matter — like HIV *71 infection — in which the privacy interest is at or near its “zenith.” Id. Based on Whalen, Doe, and Powell, we “easily” found a protected privacy interest in medical records containing “information about a person’s psychiatric health and substance-abuse history.” O’Connor, 426 F.3d at 201.
These cases make clear that a medical condition need not be as serious as HIV or transsexualism in order to be included in the scope of privacy protection.[2] That does not, of course, mean that the privacy right in the medical context is unbounded and I agree with the majority that a case-by-case analysis is necessary when determining whether a disease rises to the level where information concerning it is constitutionally protected; as we have previously stated, when dealing with dissemination of information concerning specific health issues, the “interest in the privacy of medical information will vary with the condition.” Powell, 175 F.3d at 111. The relevant inquiry is simply whether the information concerns a serious medical condition that is highly personal. See O’Connor, 426 F.3d at 201; Powell, 175 F.3d at 111; Doe, 15 F.3d at 267. Where those criteria are met, a person “should normally be allowed” to decide “for herself’ whether or not to inform others that she is so afflicted. Doe, 15 F.3d at 267.
In my view, Matson has adequately alleged the unwarranted disclosure of just such information. As the majority acknowledges, fibromyalgia is a serious medical condition, which “a growing number of courts, including our own, have recognized ... [a]s a disabling impairment.” Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir.2003) (internal citation omitted). Similarly, the Centers for Disease Control (“CDC”) explains that “CFS can be as disabling as multiple sclerosis, lupus, rheumatoid arthritis, heart disease, end-stage renal disease, chronic obstructive pulmonary disease (COPD) and similar chronic conditions.” Chronic Fatigue Syndrome: Symptoms, CDC, http://www.cdc.gov/cfs/ general/symptoms/ (last visited Dec. 22, 2010); see also David Tuller, Chronic Fatigue No Longer Seen as ‘Yuppie Flu,’ N.Y. Times, July 17, 2007, at F6 [hereinafter Yuppie Flu ] (quoting an expert at the CDC describing people with CFS to be “as sick and as functionally impaired as [those] with AIDS, with breast cancer, [or] with chronic obstructive pulmonary disease”). Defendants in fact concede that the Report of the Special Commissioner of Investigation for the NYC School District (“SCI”) disclosed a “serious medical condition” within the meaning of Doe, but focus on the fact that it did not disclose conditions that “have the potential to be fatal” (Defs.’ Br. 9 (citing Doe, 15 F.3d at 267; Fleming, 502 F.Supp.2d at 342)), and the majority similarly suggests that the non-terminal nature of the conditions significantly undermines the claim to privacy protection, ante at 65. But a physical ailment is quite obviously in no way required to be lethal in order to be a matter “so personal” that “one would prefer to maintain greater control” over whether, when, and how to dis *72 close that one is afflicted with that condition. Doe, 15 F.3d at 267.
More germane to the inquiry of what type of information is entitled to privacy protection is the consideration, highlighted by Doe and Powell, of whether a medical condition has the potential to provoke discrimination, hostility, or intolerance. We have never strictly required this factor in order to find a protected interest, but it is nevertheless a useful consideration in discerning whether the information in question is sufficiently personal. In this regard, the majority faults Matson for failing to provide “evidence in the record revealing societal discrimination and intolerance against those suffering from fibromyalgia” and/or CFS. Ante at 67. That requires too much of a complaint. Indeed, neither the Doe nor Powell complaints alleged the widespread societal discrimination and intolerance invoked in their respective opinions. (Am. Compl., Devilla v. Schriver, No. 92-cv-206 (W.D.N.Y. May 28, 1999); Compl., Doe v. City of New York, No. 92-cv-8044 (S.D.N.Y. Nov. 3, 1992).)[3] O’Connor is illustrative: Though in that case we found a protected interest in medical records without addressing the potential for discrimination, 426 F.3d at 201, the majority in this case now adds its own observation that the “combination of medical conditions” that the records in Powell reflected “is one that is likely to bring about public opprobrium,” ante at 66.
The notice pleading standard of the Federal Rules of Civil Procedure “requires only ‘a short and plain statement of the claim showing that the pleader is entitled to relief,’ in order to give the defendant fair notice of what the ... claim is and the ground upon which it rests.” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting Fed.R.Civ.P. 8(a)). The consequence of this standard is that once the complaint provides fair notice of the claim it “need not also allege specific facts establishing a prima facie case” or “include specific evidence,” Arista Records, LLC v. Doe 3, 604 F.3d 110, 119-20 (2d Cir.2010) (internal quotation marks omitted); in fact, “[t]he pleading of additional evidence, beyond what is required to enable the defendant to respond, is not only unnecessary but in contravention of proper pleading procedure,” Roth v. Jennings, 489 F.3d 499, 512 (2d Cir.2007). The corollary to Rule 8(a) is that a complaint attacked on a motion to dismiss pursuant to Rule 12(b)(6) will survive so long as the factual allegations— viewed in a light most favorable to the plaintiff and drawing all reasonable inferences in her favor — are sufficient to “raise a right to relief above the speculative level” and present a claim that is “plausible on its face.” Twombly, 550 U.S. at 555, 570, 127 S.Ct. 1955. At this stage, “the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.” Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir.1998).
Matson’s complaint alleges that on or about August 17, 2005, defendants publicly disclosed her private medical information via the Report that they published on vari *73 ous websites. This is more than sufficient to provide defendants with the required notice of the claim and defendants in fact had no difficulty identifying the allegedly offending Report. That Report recited Matson’s diagnoses of CFS and/or fibromyalgia and that recitation, as integral to the complaint, is treated as part and parcel of it. See Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir.2006). Given the undisputedly serious nature of these conditions, and the slight inference required to appreciate that a person suffering from them may reasonably desire to keep that information private, I do not believe it can be said at this early stage that, as a matter of law, the conditions are insufficiently intimate to merit privacy protection. Cf. Chance, 143 F.3d at 702-03 (holding claim of Eighth Amendment violation in failure to provide adequate dental care to state sufficiently serious medical condition to survive motion to dismiss while recognizing that “not all claims regarding improper dental care will be constitutionally cognizable”). Moreover, Matson alleges that defendants disclosed her private medical information for the “purpose of embarrassing” and “humiliatfing]” her. That is tantamount to alleging that the revelation that one is afflicted with CFS and/or fibromyalgia could be stigmatizing and is entirely plausible.
CFS is properly viewed as plausibly stigmatizing in at least two respects. Although the etiology of CFS is not well understood, various studies have linked it to one or more infectious diseases.[4] See Yuppie Flu, supra. Given such reports, there is a distinct possibility that persons believed to have CFS may be stigmatized by others who would prefer not to expose themselves to this chronic, undesirable, and potentially contagious condition. At a minimum, this possibility would justify a CFS-sufferer’s intense desire to keep his or her diagnosis private. On the flip side, for decades many have called the condition “yuppie flu” and “shirker syndrome,” reflecting the apparent belief that those who claim to suffer from it are whining and not to be taken seriously. See Yuppie Flu, supra. These circumstances also indicate that one with such a condition might prefer to keep that knowledge private rather than be viewed in such a negative light.
The majority’s purported reasons for the contrary conclusion do not withstand scrutiny. Rebuffing Matson’s citation to LaBrecque v. Sodexho USA, Inc., 287 F.Supp.2d 100, 103 (D.Mass.2003), as not supporting her contention that persons suffering from fibromyalgia may be targeted for discrimination, the majority focuses on a single statement in that opinion that fibromyalgia may impair a person’s ability to work. Ante at 67-68. While that fact alone may not indicate anything about discrimination, in finding that the plaintiffs claim of discrimination under the Americans with Disabilities Act (“ADA”) survived defendants’ motion for summary judgment, LaBrecque more broadly confirms the plausibility of the notion that fibromyalgia may engender discrimination. Additional cases reaching similar results *74 with respect to CFS and/or fibromyalgia, including our own, suggest that LaBrecque is not an aberration and further underscore the plausibility of a more widespread phenomenon of discrimination related to these medical conditions. See, e.g., E.E.O.C. v. Chevron Phillips Chem. Co., 570 F.3d 606 (5th Cir.2009) (finding genuine issues of material fact as to whether employer discriminated against CFS sufferer in violation of the ADA); Weixel v. Bd. of Educ., 287 F.3d 138 (2d Cir.2002) (finding allegations of discrimination against person with CFS and fibromyalgia sufficient to state an ADA claim); Holt v. Olmsted Twp. Bd. of Trs., 43 F.Supp.2d 812 (N.D.Ohio 1998) (denying motion for summary judgment to dismiss ADA claims of discrimination against CFS/fibromyalgia sufferer).
The statement in Rankin v. New York Pub. Library, No. 98 Civ. 4821, 1999 WL 1084224 (S.D.N.Y. Dec. 2, 1999), finding no evidence in the record of that case of a social stigma attendant to fibromyalgia on par with that attendant to AIDS does not diminish this possibility. As the majority recognizes, that case arose in an entirely different context — that of a plaintiff seeking to proceed under a pseudonym. Id. at *1. The District Court denied the request, finding the plaintiffs privacy interest to be “outweigh[ed] [by] the long-standing policy of open judicial proceedings.” Id. One affirmatively coming into court is apt to lose a measurable degree of privacy and the considerations presented in that situation are undeniably different. Indeed, while Rankin suggests that the stigma attached to alcoholism is insufficient to allow a plaintiff to proceed anonymously, id. at *1 (citing Doe v. Frank, 951 F.2d 320, 324 (11th Cir.1992)), alcoholism appears to be precisely the type of condition which the majority finds to carry the requisite level of public opprobrium, see ante at 66 (noting that identification of individuals who become dangerous after drinking may constitute the “official branding of a person” (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)). Even if the comparison to a plaintiff seeking anonymity were appropriate, Rankin’s observation does not take us far. As already discussed, nothing in Doe or Powell set any minimum standards for the level of discrimination that a condition must provoke in order to be protected. Accordingly, it is of no moment that the discrimination faced by one with fibromyalgia and/or CFS may be less severe than that which a person with HIV and/or AIDS may face.
The majority’s reference to the fibromyalgia drug Lyrica (noted first by the District Court) is also puzzling. Neither the majority nor the District Court explain how the fact of televised advertisements for a drug treatment bears on the issue of whether a condition is highly personal or carries social stigma.[5] 6 Even if advertise *75 ment of drug therapy were somehow relevant, there is no similar treatment available (let alone advertised) for CFS. See Chronic Fatigue Syndrome: Treatment for CFS, CDC, http://www.cdc.gov/cfs/general/ treatment/index.html (last visited Dec. 22, 2010) (“There is no cure, [and] no prescription drugs have been developed specifically for CFS.”).
In short, the lack of any express allegation of past societal discrimination against those with CFS and/or fibromyalgia does not doom Matson’s complaint.
The majority also treats as significant the lack of any proper allegation that Matson herself was discriminated against following disclosure. However, while whether the plaintiff actually suffered discrimination or was otherwise harmed by such disclosure is relevant to the issue of damages should liability be found, it is not the proper focus in determining the scope of the privacy right. Instead, in using discrimination as a proxy for ascertaining whether information is sufficiently personal to be protected, the proper consideration is the ex ante likelihood of stigmatization from the unwanted disclosure. Cf. Powell, 175 F.3d at 111 (finding privacy right where disclosure of a serious medical condition is “likely” to provoke “hostility and intolerance”); Doe, 15 F.3d at 267 (finding same where disclosure “potentially” results in “discrimination and intolerance”). In this regard, actual discrimination, hostility, or intolerance towards Matson is relevant only insofar as it may bolster the notion that this is the type of information that is likely to generate such a response. As already recounted, however, the complaint adequately indicates the plausibility of this notion and no more is needed at this stage.
In light of the above, I believe that information concerning a person’s diagnosis of CFS and/or fibromyalgia falls comfortably within the ambit of plausible constitutional privacy protection as established by Whalen, Doe, and their progeny. It is entirely plausible that the disclosed information is of the type that is highly personal and potentially embarrassing, such that one would and normally should be able to choose whether to inform others that she suffers from these serious conditions.
The existence of a privacy right is of course not alone sufficient to constitute a constitutional violation. Even where there is a protectable interest in the confidentiality of information, that right may be waived. Powell, 175 F.3d at 112 n. 1. Additionally, the “confidentiality interest is not absolute ... and can be overcome by a sufficiently weighty government purpose.” Statharos v. N.Y. City Taxi & Limo. Comm’n, 198 F.3d 317, 323 (2d Cir.1999). There is no dispute that Matson has adequately alleged that defendants disclosed matters without her permission. There is nothing in the fact of Matson’s provision of her medical information to the BOE in support of her application for a leave of absence that could be considered to authorize the public dissemination of that information and Matson asserts that “[a]t no time” did she authorize such release.
Matson has also alleged unwarranted disclosure. Defendants have not argued that, if Matson’s medical information were protected, they would have been justified in releasing it. That the SCI has the authority to — and apparently regularly does — publicly issue investigative reports does not in itself supply an adequate justification for publicly disseminating Mat-son’s medical information. There is no indication why the public dissemination of *76 the Report would have been any less effective in achieving any legitimate purpose without identifying Matson’s specific diagnosis; indeed, that the Report remains on the SCI’s website with Matson’s private medical information redacted suggests just the opposite.
Where a plaintiff challenges executive action, however, only “conduct that ‘shocks the conscience[ ]’ will subject the government to liability for a substantive due process violation.”[6] O’Connor, 426 F.3d at 203. While “necessarily imprecise,” the shocks-the-conscience test “depends on the state of mind of the government actor and the context in which the action was taken.” Id. (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). To the extent that Matson’s allegation that defendants publicly broadcast her private information intending to embarrass and humiliate her is true, it would suffice. See id. (“[I]f the Board intended to injure or to spite O’Connor by insisting on a needlessly broad medical release as a condition of his reinstatement, that intent would plainly support liability in light of County of Sacramento.”).
Both the majority and the District Court pay excessive attention to the suggestion that Matson abused her sick-leave time during her employment with the BOE. Such actions, even if true, are wholly irrelevant to whether Matson’s medical diagnoses are the type of information entitled to privacy protection and serve only to unnecessarily paint an unflattering picture of Matson. This is especially so given that the disciplinary charges against Matson have been withdrawn. What was not — • and cannot be — -withdrawn, however, is the public dissemination of Matson’s intimate medical information.
For the foregoing reasons, I believe the District Court’s decision should be reversed. A Whalen/Doe privacy claim in the medical context, while not unbounded, is not so narrowly limited to the extreme privacy violations at issue in our previous cases and is broad enough to cover Mat-son’s privacy claim. Matson has alleged an unauthorized and unwarranted disclosure of potentially protected information sufficient to withstand a motion to dismiss. Accordingly, I respectfully dissent.
II. BOE As Defendant
In addition to dismissing Matson’s complaint for failure to state a claim, the District Court concluded that even if the privacy claim were viable, the BOE would not be a proper defendant. The majority’s disposition obviated its need to address Matson’s argument that the dismissal of the BOE was erroneous; because I would reinstate Matson’s privacy claim, I briefly address this issue.
In separately dismissing the BOE, the District Court first noted that in 2002 the BOE was stripped of its status as a semi-autonomous agency and renamed the New York City Department of Education (“DOE”). Matson v. Bd. of Educ., No. 08 Civ 7232, 2009 WL 2462513, at *1 n. 1 (S.D.N.Y. Aug.7, 2009). The court then analyzed the DOE’s amenability to suit and concluded that it was not amenable because, pursuant to the New York City Charter, as a city agency the DOE cannot be sued in its own name, and, in any event, because the SCI is independent of the DOE, Matson cannot allege any actions taken by the DOE that would subject it to *77 liability. Id. There are several errors in this chain of logic.
First, while the District Court is largely correct that, following the 2002 amendments to the Education Law, the BOE is now frequently referred to as the DOE, e.g., D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503, 506 n. 1 (2d Cir.2006), the two are not entirely synonymous. The BOE “is created by the Legislature of the State of New York and derives its powers from State law.” Bylaws of the Panel for Educational Policy of the Department of Education of the City School District of the City of New York, Preamble, available at http://schools.nyc. gov/NR/rdonlyres/B432D059~6BFE-41988453-466FDE2B22D5/69835/PEPBylawsFi nal91409.pdf [hereinafter BOE Bylaws]. By statute, the BOE remains in existence. See N.Y. Educ. Law § 2590-b(l)(a) (“The board of education of the city school district of the city of New York is hereby continued.”). The DOE, by contrast, is a creation of the BOE through the BOE’s bylaws and is comprised of the thirteen BOE members along with “the Chancellor, superintendents, community and citywide councils, principals, and school leadership teams.” BOE Bylaws, Preamble.
Matson has sued the BOE (as one of three defendants along with the City and the SCI) and nothing about the BOE’s creation of an additional broader entity would appear to require suits against the DOE instead of the BOE.[7] Cf. Nacipucha v. City of New York, 18 Misc.3d 846, 849 N.Y.S.2d 414, 419 (Sup.Ct.2008) (quoting an official notice in the November 12, 2002 edition of the New York Law Journal explaining how to serve process on either “the New York City Department or Board of Education”). Moreover, the New York City Charter does not preclude suits directly against the BOE. Section 396 of the Charter provides that “[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law.” N.Y. City Charter § 396 (2009), available at http://www.nyc.gov/html/charter/ downloads/pdfrcitycharter2009.pdf. That provision “has been construed to mean that New York City departments, as distinct from the City itself, lack the capacity to be sued.” Ximines v. George Wingate High Sch., 516 F.3d 156, 160 (2d Cir.2008). The BOE, however, is neither a department nor agency of the City. Historically, the BOE “was created as a public corporate entity which is ... separate and distinct from the City of New York.” Nacipucha, 849 N.Y.S.2d at 417. As such, the BOE could be — and indeed was required to be — separately sued for its alleged torts, as the City could not be held liable for the BOE’s actions. Id. The Appellate Division of the New York Supreme Court has held that the 2002 restructuring of the BOE did not alter this system: “[T]he City and the Board remain separate legal entities[;]” “[t]he legislative changes do not abrogate the statutory scheme for bringing lawsuits arising out of torts allegedly committed by the Board and its employees, and the City cannot be held liable for those alleged torts.” Perez ex rel. Torres v. City of New York, 41 A.D.3d 378, 837 N.Y.S.2d 571, 572 (1st Dep’t 2007), leave to appeal denied, 10 N.Y.3d 708, 859 N.Y.S.2d 393, 889 N.E.2d 80 (2008). Recourse for alleged wrongs committed by the BOE thus remain redressable through suits against the BOE. See Nacipucha, 849 N.Y.S.2d at *78 419 (explaining how to serve process on the BOE or DOE, as distinct from the City); Lee S. Kreindler et al., New York Practice Senes — New York Law of Torts § 17:56(2010).
Notably, defendants do not now and did not below suggest otherwise, as one would certainly expect the BOE or the City to have done if there were a wholesale prohibition on suits against the BOE.[8] In fact, seemingly to the contrary, defendants explained below that “it is well-settled that the Board of Education and the City of New York are separate and district entities.” (Br. in Support of Defs.’ Mot. to Dismiss, at 3, Matson v. Bd. of Educ., No. 08-cv-7232 (S.D.N.Y. Jan. 16, 2009).) And for this reason defendants argued — and the District Court adopted this reasoning in the alternative — that the BOE should be dismissed since the SCI, which authored the offending Report, operates through the City and is thus a legal entity distinct from the BOE. However, even if the SCI’s investigation cannot be attributed to the BOE, Matson alleges that the BOE participated in publicly releasing the SCI’s Report, thus alleging wrongful actions directly by the BOE.
For these reasons, there is no additional barrier to Matson’s suit against the BOE at this juncture and I would reverse the decision of the District Court in this regard as well.
III. Sua Sponte Recusal
Finally, though not raised below, Matson now claims that the District Judge erred in failing to sua sponte recuse himself from this matter. As there is no basis to find that the Judge’s “impartiality might reasonably be questioned,” 28 U.S.C. § 455(a), I concur in the majority’s conclusion that recusal was not required. I offer but two additional observations in direct response to Matson’s claims that the Judge’s previous employment with the City of New York and his niece’s current employment with the DOE present disqualifying conflicts.
A judge’s prior governmental service, even with the same entity appearing before the judge as a party, does not automatically require recusal. Rather, prior governmental service disqualifies a judge from presiding over a matter only if the judge directly participated in the matter in some capacity or expressed an opinion concerning the merits of the particular case. 28 U.S.C. § 455(b)(3); accord Code of Judicial Conduct for United States Judges Canon 3(C)(1)(e), available at http://www. *79 uscourts.gov/rulesandpolicies/Codesof Conductaspx [hereinafter CJC]. Matson does not contend — nor is there any indication — that the District Judge was in any way involved in this case prior to his assignment to the instant matter and, accordingly, his earlier service for the City does not require recusal.
Nor was the District Judge required to recuse himself on account of his niece’s employment with the DOE. Matson contends that his niece is a “high level executive” of the BOE or the DOE. (Matson Br. 54.) Were that true, Matson’s claim might have some bite. A judge shall disqualify himself if a “person within the third degree of relationship to” him— which includes one’s niece — “[i]s a party to the proceeding, or an offer, director, or trustee of a party.” 28 U.S.C. § 455(b)(5)(i); accord CJC Canon 3(C)(1)(d)®. But the document Matson cites in support of her assertion suggests no more than that the District Judge’s niece is the head of a single subsidiary office within the DOE — the Office of Multiple Pathways to Graduation — wholly unconnected to Matson, her employment, or the issues presented in this case. The niece’s capacity as such does not present any problems.
CONCLUSION
In sum, I believe that Matson has adequately stated a claim of a privacy violation and, accordingly, would reverse the District Court’s grant of defendants’ motion to dismiss and reinstate the claim with respect to all three defendants. Because the majority concludes otherwise, I respectfully dissent. I concur only in the rejection of Matson’s claim that the District Judge should have sua sponte recused himself.

. As an initial matter, contrary to the Report’s disclosure that Matson suffers from "chronic fatigue syndrome, known as fibromyalsia [sic],” as the majority notes, see ante at 59 n. 1, the two conditions are in fact related but distinct. See Chronic Fatigue Syndrome: Alternative Medicine, Mayo Clinic, http://www. mayoclinic.com/health/chronic-fatiguesyndrome/DS003 95/DSECTION=alternative-medicine (last visited Dec. 22, 2010) (describing fibromyalgia as "a disease that is considered similar to CFS”). Nevertheless, though the Report states that Matson has CFS, and though Matson complains about the public dissemination of her illnesses of “fibromyalgia and/or chronic fatigue syndrome” (e.g., Matson Br. 37, 38), the majority discusses only fibromyalgia, noting that the conditions are often discussed interchangeably. Because both the parties and the majority largely treat the two conditions as one, and because they are similar, I shall for the most part likewise not dwell on any differences between the conditions for purposes of this analysis.

. In fact, though the majority emphasizes the narrow confines of the right to privacy, we do not appear to have ever rejected a privacy claim concerning medical information on the grounds that the information is not encompassed within the right to confidentiality. Indeed, even many of the lower court cases defendants cite in support of their argument that Matson’s medical information is not entitled to protection find not that the information is not protected, but that disclosure of the information was justified. See infra at 75 - 76 for discussion of when protected information may be disclosed without infringing on the right to privacy.

. And though Powell arose following a jury trial, there is no indication that any evidence of societal discrimination was even offered at trial. That said, both the Doe and Powell plaintiffs did allege actual discrimination against themselves following disclosure. Powell, 175 F.3d at 109; Doe, 15 F.3d at 265. Similarly, the deep history of discrimination against those with sickle cell anemia recited by the District Court in Fleming is nowhere found in that complaint, though the plaintiff alleged adverse action against him personally. (See Am. Compl., Fleming v. State Univ. of N.Y., No. 05-cv-5386 (E.D.N.Y. Jun. 23, 2006).)

. Some studies link CFS to a virus from the same family as HIV. Denise Grady, Vims is Found in Many with Chronic Fatigue Syndrome, N.Y. Times, Oct. 9, 2002, at A14. These viruses "insert themselves into their hosts' genetic material and stay for life.” Id. While other studies challenge this correlation, at this point the American Red Cross will not accept blood donations from those with CFS, and the U.S. Food and Drug Administration is considering a similar ban. Simeon Bennett, Mouse Vims Link to Chronic Fatigue Syndrome is Challenged in Four Studies, Bloom-berg, Dec. 21, 2010, http://www.bloomberg. com/news/prin1/2010-12-21/mouse-virus-linkto-chronic-fatigue-syndrome-is-challenged-in-four-studies.html (last visited Dec. 22, 2010).

. Genital herpes — which would appear to meet the majority’s definition of a condition entitled to privacy protection, see ante at 67-68 (suggesting that information about sexually transmitted diseases would carry sufficient opprobrium to be protected) — also has a drug therapy, Valtrex, commonly advertised on television. See, e.g., CBS News, 2V Drug Ads Too Emotional, Study Shows, Jan. 29, 2007, http ://www. cbsnews. com/stories/2007/01/29/ health/webmd/main2411011.shtml (last visited Dec. 22, 2010) (describing television advertisement for Valtrex). Moreover, although the majority acknowledges the existence of a variety of drugs to manage HIV, it does not go on to consider that drug makers frequently advertise these drugs too. See, e.g., Ron Leuty, FDA: Gilead Ad For Truvada ‘Misleading,’ S.F. Bus. Times, Apr. 9, 2010; Rebecca Ruiz, Ten Misleading Drug Ads, Forbes.com, Feb. 2, 2010, http://www.forbes.com/2010/02/02/ drug-advertising-lipitor-lifestyle-health-phar maceuticals-safety.html (last visited Dec. 22, 2010) (mentioning Abbott Laboratories’ advertisement for the HIV drug Kaletra); *75 Jeanne Whalen, Glaxo’s HIV-Drug Ads Draw Critics, Wall St. J., Aug. 25, 2008.

. These rules are significantly loosened in the prison context. Prison officials impinge on an inmate’s right to privacy "only to the extent that their actions are [not] reasonably related to legitimate penological interests.” Powell, 175 F.3d at 112 (internal quotation marks omitted).

. Indeed, the BOE has repeatedly been sued in its own name for alleged wrongs committed after 2002 without discussion. E.g., Weintraub v. Bd. of Educ., 593 F.3d 196 (2d Cir.2010); Mulgrew v. Bd. of Educ., 75 A.D.3d 412, 906 N.Y.S.2d 9 (1st Dep’t 2010).

. Although in their brief below, defendants repeatedly referenced the "BOE," on appeal they state that, following the District Court’s lead, they will refer to the BOE as the DOE. (Defs.’ Br. 3 n. 2.) Still, however, they do not argue that the DOE is not a proper party for the broad reason that the DOE cannot be sued in its own name. (In fact, on appeal, defendants do not in any way defend the District Court’s separate dismissal of the BOE/DOE.)
In any event, its name as the New York City Department of Education notwithstanding, the DOE does not appear to be a city department within the contemplation of the City Charter. As we have previously observed, "departments of the City of New York typically, perhaps uniformly, have been created by the City Charter, which does not create a New York City Department of Education.” Xi-mines, 516 F.3d at 159. InXimines, after we remanded to the District Court to determine whether the DOE "is a subdivision of the Board as opposed to a department of the City" and whether it has "the capacity to be sued," id.., the parties stipulated that "the Defendant in the above action will be ‘The New York City Department of Education.’ " (Stipulation, Ximines v. New York City Dep’t of Educ., No. 05-cv-1214 (E.D.N.Y. Mar. 21, 2008).) While this stipulation is of course not dispositive, it does suggest that the City Charter does not preclude suits against the DOE. As Matson has sued the BOE, and not the DOE, however, this is a matter I need not definitively resolve.